**IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Delia Gottke** | \* |
| **6010 Highgate Drive** | |
| **Baltimore, Maryland 21215** | \* |
| | |
| **Tim Linaberry** | \* |
| **904 North Calvert Street #1** | |
| **Baltimore, Maryland 21202** | \* |
| | |
| **Luke Percy** | \* |
| **718 South Hanover Street** | |
| **Baltimore, Maryland 21230** | \* |
| | |
| **Arianna Wilgar** | \* |
| **5737 Main Street, Apt. 5** | |
| **Elkridge, Maryland 21075** | \* |
| | |
| **Plaintiff** | \* |
| **v.** | |
| | \* |
| **Ammoora, Inc.** | |
| **751 Key Highway** | \* |
| **Baltimore, Maryland 21230** | |
| | \* |
| **Jay J. Salkini** | |
| **7225 Preservation Ct.** | \* |
| **Fulton, Maryland 20759** | |
| | \* |
| **Markie Britton** | |
| **751 Key Highway** | \* |
| **Baltimore, Maryland 21230** | |
| | \* |
| **Andy Salkini** | |
| **751 Key Highway** | \* |
| **Baltimore, Maryland 21230** | |
| | \* |
| **Colin Kahoe** | |
| **751 Key Highway** | \* |
| **Baltimore, Maryland 21230** | |
| | \* |
| **Defendants** | |

Case No. _____
**JURY TRIAL REQUESTED**

_____/

**COMPLAINT**

Plaintiff Delia Gottke ("Gottke"), Tim Linaberry ("Linaberry"), Luke Percy ("Percy"), and Arianna Wilgar ("Wilgar") (collectively, the "Plaintiffs") by and through their undersigned counsel, state a complaint against Defendants Ammoora, Inc. ("Ammoora"), Jay J. Salkini ("J. Salkini"), Markie Britton ("Britton"), Andy Salkini ("A. Salkini"), and Colin Kahoe ("Kahoe") (collectively, the "Defendants"), pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and further allege supplemental state law claims under the Maryland Wage and Hour Law, Md. Code, LE Art. § 3-401 *et seq* ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code, LE Art. § LE 3-501 *et seq.* ("MWPCL").  Plaintiffs also state a complaint pursuant to common law breach of contract.  Plaintiffs request a jury trial, as follows:

## **Introduction**

1.      This is an action for unpaid minimum and overtime wages, unlawful retention of tips, liquidated and statutory damages, and other relief provided by the FLSA, 29 U.S.C. § 201 *et seq.*, the MWHL, Md. Code, LE Art. § 3-401 *et seq.*, the MWPCL, Md. Code, LE Art. § 3-501 *et seq*, and common law breach of contract.  Plaintiff Gottke and Wilgar further seek damages suffered as a result of Defendants' unlawful and retaliatory termination of them in violation of FLSA, 29 U.S.C. § 215(a)(3), made actionable pursuant to 29 U.S.C. § 216(b).

2.      In addition to the actual sums owed in unpaid minimum and overtime wages, unlawfully retained tips, emotional distress damages, economic loss damages, punitive damages, liquidated and statutory damages pursuant to the FLSA, MWHL, MWPCL, and common law breach of contract, Plaintiffs seek attorneys' fees and costs as provided under the under the FLSA, MWHL, and MWCPL.

## **Jurisdiction and Venue**

3.      This Court has subject matter/original jurisdiction over this action pursuant to 29 U.S.C. §

206, 29 U.S.C. § 207, and 28 U.S.C. § 1331.

4.      This Court has supplemental jurisdiction over the MWHL and MWPCL claims pursuant to 28 U.S.C. § 1367(a) because the unpaid minimum and overtime wage, and failure to pay wage claims asserted under the MWHL and MWPCL, as well as the common law breach of contract claims, are related to the FLSA claims, insofar as they rely on the same evidence and are based on the same factual allegations as the FLSA claims, that they form part of the same case or controversy.

5.      Venue and personal jurisdiction are proper pursuant to 28 U.S.C. § 1391(b), because Defendants do business within this judicial district and the events and omissions giving rise to the claims in this Complaint occurred in this judicial district.

## Parties

6.      Defendant Ammoora, Inc. is a corporation formed in the State of Maryland, which operates the restaurant Ammoora, located at 751 Key Highway, Baltimore, Maryland 21230.

7.      Defendant Ammoora is owned and operated by Defendants Jay J. Salkini.

8.      At all times material herein, Defendant Ammoora had an annual gross volume of sales made or business done in an amount exceeding $500,000.00.

9.      Defendant Ammoora employs at least two or more employees who are engaged in commerce, produce goods for commerce, or handle, sell, or otherwise work on goods or materials that have moved in or were produced for commerce as a single enterprise under the FLSA.  For instance, there are employees of the Defendant who negotiate and purchase food from producers and suppliers who operate in interstate commerce.  There are employees who cook, serve, and otherwise handle this food, as well as the beverages, that cross interstate and even international boundaries.

10.     There are employees who regularly use wire and electronic means of communicating interstate, including the Plaintiff and other servers, who also regularly sell food and beverages that have moved in interstate commerce, and who regularly process credit card transactions for customer payments.  There are employees who use, in the Defendant restaurant, cleaning products, dishes, tools, utensils, napkins, menus, signage, among other items, that have moved in interstate commerce.

11.     Accordingly, subject matter jurisdiction exists because Plaintiff was employed by Defendant Ammoora, a covered entity, which satisfies the enterprise coverage provisions under the FLSA.  Defendant Ammoora also satisfies the coverage provisions of the MWHL.  As a covered enterprise, Defendant Ammoora has at all material times been an "employer" within the meaning of the FLSA, MWHL and MWPCL.

12.     Defendant J. Salkini is one of the owners of Defendant Ammoora, and at all material times, has been actively engaged in the operation of Defendant Ammoora.

13.     Defendant J. Salkini was regularly present, overseeing and managing the day-to-day operations of Ammoora.  Defendant J. Salkini was regularly on-site, and would direct other employees, assist with the expo of food when the restaurant was busy, help process payments, talk to guests and greet tables, and help to control the rotation of guest seating.  Defendant J. Salkini led many pre-shift meetings, providing instruction and direction to employees, including Plaintiffs.

14.     Defendant J. Salkini had final authority as to many matters, including wages, tip out policies and practices, how certain events would be run, how certain events would pay the employees who worked it, items that would go on and off the menu, and the overall policies of the restaurant.

15.     On at least one occasion, Defendant J. Salkini terminated another employee, named Abdul.

Defendant J. Salkini also hired an employee by name of Aiman Baira, as well as the assistant general manager Nathan Cuthrell.  Moreover, as one of the owner of Defendant Ammoora, at all times, Defendant J. Salkini had the authority to hire and fire or direct the hiring and firing of any employees or workers.

16.     Defendant Britton is one of the owners, the Chief Marketing Office and one of the General Manager of Ammoora, and at all material times, been actively engaged in the operation of Defendant Ammoora.

17.     Like Defendant J. Salkini, she is regularly present, overseeing and managing the day-to-day operations of Ammoora. She was on-site as frequently as Defendant J. Salkini, Defendant Britton directed employees, set their schedule, designed the restaurant, and interviewed and hired employees, including Plaintiff Gottke and Linaberry.  Moreover, as one of the owners of Defendant Ammoora, at all times, Defendant Britton had the authority to hire and fire or direct the hiring and firing of any employees or workers.

18.     Along with Defendant Salkini, she also led many pre-shift meetings, particularly those meetings where changes to pay and compensation for tipped employees, including Plaintiffs, were being promulgated.

19.     Defendant A. Salkini is one of the owners, the Purchasing Manager, and Accountant for Ammoora, as well as a floor manager when needed.  Defendant A. Salkini is regularly present at the restaurant, overseeing and managing the day-to-day operations of Ammoora.   As the accountant for Ammoora, he handled payroll for employees, including Plaintiffs.  When he was working as a floor manager, he would oversee the expo line and direct employees where to deliver food or which tables needed to be expedited.  Defendant A. Salkini also assisted with voids on the Point-of-Sale system or any other technical issues employees had.  If employees had work place

issues, they could go to him for resolution.  For example, the one time Plaintiff Gottke was permitted to see how her tip outs were being calculated, it was Defendant A. Salkini who showed her.  On another occasion, a server assistant who had been saying inappropriate things to one of the dishwashers, was reported to Defendant A. Salkini, who after speaking with the dishwasher, fired the server assistant for harassment.  As one of the owners of Defendant Ammoora, at all times, Defendant A. Salkini, had the authority to hire and fire or direct the hiring and firing of any employees or workers.

20.     Defendant Kahoe is one of the General Managers of Ammoora who is regularly present, overseeing and managing the day-to-day operations of Ammoora. He is present five days a week, and as general manager, directed and oversaw other employees in their various tasks.  Defendant Kahoe also engaged in hiring and firing, having hired and fired Plaintiff Percy.  Defendant Kahoe also had authority to set or alter the schedule of employees, including cutting the shifts of Plaintiff Gottke and Wilgar in order to constructively terminate them in retaliation for them brining complaints about their wages and tips.

21.     In addition to overseeing and managing all aspects of the restaurant, Defendants J. Salkini, Britton, A. Salkini, and Kahoe would at various points, also work from the restaurant's office, handling administrative and financial matters for the restaurant, and upon information and belief have custody and control of Defendant Ammoora's business records, including the employment records of Plaintiffs,  and were responsible for maintaining those records.

22.     Defendants J. Salkini, Britton, A. Salkini, and Kahoe all receive income from Defendant Ammoora and are ultimately responsible for all legal compliance.

23.     At all times material herein, Defendants J. Salkini, Britton, A. Salkini, and Kahoe have been employers within the meaning of the FLSA, the MWHL, and the MWPCL.  Defendants J.

Salkini, Britton, A. Salkini, and Kahoe are jointly and individually liable for damages to the Plaintiffs, arising under the FLSA, the MWHL, and the MWPCL.

24.   For all times pertinent to this lawsuit, Plaintiffs worked as tipped employees (servers) for the Defendants.

25.   As set forth below, Plaintiffs seek unpaid minimum and overtime wages, and unlawfully retained tips, in amounts to be determined based on the evidence, as well as liquidated and statutory damages, pursuant to the FLSA, MWHL, and MWPCL, and attorneys' fees and costs as provided under the FLSA, MWHL, and MWCPL.

26.   Plaintiffs Gottke and Wilgar also seek damages for emotional distress, economic loss, as well as punitive damages pursuant to the FLSA for retaliatory actions suffered by them.

27.   Plaintiffs, who received tipped income, were non-exempt under the FLSA and MWHL's minimum and overtime wage requirements, and tip retention requirements.

28.   By failing to pay the statutory minimum and overtime wages that were due to Plaintiffs, as well as unlawfully retaining tips, Defendants willfully violated very clear and well-established minimum and overtime wage, and tip retention provisions of the FLSA.

29.   Plaintiffs also seeks pre-judgment interest on all amounts owed under the MWHL, liquidated damages as allowed by the MWHL, and three times the minimum wages and overtime wages owed under the MWHL pursuant to the statutory damage provisions of the MWPCL, and attorneys' fees and costs as provided under the FLSA, MWHL and MWPCL.

**Factual Allegations**

Delia Gottke

30.   Plaintiff Gottke was employed by the Defendants from, on or about January 24, 2023 until August 22, 2023.

31.     Plaintiff Gottke was originally employed as a server and promised an hourly wage of $10.00 per hour in addition to tips.

32.     However, after the first pay period, on or about February 6, 2023, and with no written notice, Plaintiff Gottke's pay was changed to $3.63 per hour in addition to tips.

33.     Plaintiff Gottke typically worked five days a week.  When she first started, she would typically work Wednesday through Sunday.

34.     Around April or May 2023, Plaintiff Gottke's five-day work schedule changed to Monday, Tuesday, Friday, Saturday and Sunday.

35.     However, Plaintiff Gottke's schedule was subject to occasional change based on the needs of the restaurant.

36.     If Plaintiff Gottke worked between Monday and Thursday, she would typically start her shift around 3:45 PM.  If Plaintiff Gottke worked Friday or Saturday, she would typically start her shift around 3:30 PM.

37.     Plaintiff Gottke's shifts would end anywhere between 10:00 PM and 12:00 AM depending on restaurant operations.

38.     Ammoora did not open its doors until 5:00 PM, however.  Moreover, Plaintiff Gottke, would often times not receive their first table until an hour after opening.

39.     During this time before Plaintiff Gottke received her first table of guests, she would engage in non-tipped side work, including but not limited to rolling silverware, cleaning silverware and glassware, participating in the pre-shift meeting, and otherwise preparing the restaurant for the arrival of guests.

40.     Likewise, during the last hour or so of the shift, Plaintiff Gottke would engage in non-tipped side work, such as cleaning tables, silverware and glassware, and otherwise preparing the

restaurant for the next day.

41.     As a result, Plaintiff Gottke could spend approximately two to three hours *per shift* engaging in non-tipped side work.  In other words, Plaintiff Gottke would spend between approximately 25% and 50% of her shift – depending on its length – engaged in non-tipped side work.  Therefore, Plaintiff Gottke spent a substantial amount of time performing non-tipped work, as defined by 29 C.F.R. § 10.28(b)(3)(iv).

42.     However, at all times, regardless of whether Plaintiff Gottke was actually engaged in tip-generating work, she was only paid a sub-minimum wage of $3.63/hour.

43.     Additionally, on at least a few occasions, Plaintiff Gottke worked in excess of forty (40) hours per statutory work week.  However, on at least one occasion, Plaintiff Gottke was paid at an overtime rate of only $5.44 per hour, which is the incorrect overtime even if Defendants can lawfully take a credit of each Plaintiff's tips against Defendants' minimum wage obligations, which Plaintiffs further deny the Defendants may legally do

Tim Linaberry

44.     Plaintiff Linaberry has been employed by the Defendants since from, on or about the end of January, 2023 to the present.

45.     Plaintiff Linaberry is employed as a server and paid at a rate of $3.63 per hour plus tips.

46.     Plaintiff Linaberry's schedule varied from week to week but would average between fifteen (15) and twenty-five (25) hours per week.

47.     Plaintiff Linaberry is typically scheduled to begin work at 4:00 PM.

48.     Plaintiff Linaberry's shifts would end anywhere between 10:00 PM and 12:00 AM depending on how busy the restaurant was.

49.     Ammoora did not open its doors until 5:00 PM, however.  Moreover, Plaintiff Linaberry,

would often times not receive his first table until an hour after opening.

50.     During this time before Plaintiff Linaberry received his first table of guests, he would engage in non-tipped side work, including but not limited to rolling silverware, cleaning silverware and glassware, participating in the pre-shift meeting, and otherwise preparing the restaurant for the arrival of guests.

51.     Likewise, during the last hour or so of the shift, Plaintiff Linaberry would engage in non-tipped side work, such as cleaning tables, silverware and glassware, and otherwise preparing the restaurant for the next day.

52.     As a result, Plaintiff Linaberry could spend approximately two to three hours *per shift* engaging in non-tipped side work.  In other words, Plaintiff Linaberry would spend between approximately 25% and 50% of his shift – depending on its length – engaged in non-tipped side work.  Therefore, Plaintiff Linaberry spent a substantial amount of time performing non-tipped work, as defined by 29 C.F.R. § 10.28(b)(3)(iv).

53.     However, at all times, regardless of whether Plaintiff Linaberry was actually engaged in tip-generating work, he was only paid a sub-minimum wage of $3.63/hour.

<u>Luke Percy</u>

54.     Plaintiff Percy was employed by the Defendants from, on or about the June 2023 to, on or about November 17, 2023.

55.     Plaintiff Percy was originally hired as a server and paid at a rate of $3.63 per hour plus tips.

56.     Plaintiff Percy was scheduled to work two shifts per week, typically Thursday and Friday evenings, although sometimes he would work Thursday and Saturday evenings.

57.     Plaintiff Percy was typically scheduled to begin work at 4:00 PM on Thursdays or Fridays, and 3:00 PM if he was working on a Saturday.

58.     Plaintiff Percy's shifts would end anywhere between 10:45 PM and 11:30 PM depending on how busy the restaurant was.

59.     Ammoora did not open its doors until 5:00 PM, however.  Moreover, Plaintiff Percy, would often times not receive his first table until an hour, sometimes even an hour and a half, after opening.

60.     During this time before Plaintiff Percy received his first table of guests, he would engage in non-tipped side work, including but not limited to rolling silverware, cleaning silverware and glassware, participating in the pre-shift meeting, and otherwise preparing the restaurant for the arrival of guests.

61.     Likewise, during the last hour or so of the shift, Plaintiff Percy would engage in non-tipped side work, such as cleaning tables, silverware and glassware, and otherwise preparing the restaurant for the next day.

62.     As a result, Plaintiff Percy could spend approximately two hours *per shift* engaging in non-tipped side work.  In other words, Plaintiff Percy would spend between approximately 25% and 35% of his shift – depending on its length – engaged in non-tipped side work.  Therefore, Plaintiff Percy spent a substantial amount of time performing non-tipped work, as defined by 29 C.F.R. § 10.28(b)(3)(iv).

63.     However, at all times, regardless of whether Plaintiff Percy was actually engaged in tip-generating work, he was only paid a sub-minimum wage of $3.63/hour.

<u>Arianna Wilgar</u>

64.     Plaintiff Wilgar was employed by the Defendants from, on or about January 1, 2023 until on or about September 10, 2023.

65.     Plaintiff Wilgar was originally employed as a server and promised an hourly wage of

$10.00 per hour in addition to tips.

66.     However, after the first pay period, on or about February 6, 2023, and with no written notice, Plaintiff Gottke's pay was changed to $3.63 per hour in addition to tips.

67.     Plaintiff Wilgar typically worked two days a week.  Plaintiff Wilgar would almost always work Sunday nights and then every week she would alternate working either Thursday night or Friday night.

68.     However, Plaintiff Wilgar's schedule was subject to occasional change based on the needs of the restaurant as well as her own availability to pick up additional shifts.  As a result, Plaintiff Wilgar would sometimes also work Saturdays.

69.     Plaintiff Wilgar was typically scheduled to start her shift at 4:00 PM.

70.     Plaintiff Wilgar's shifts would end anywhere between 10:30 PM and 11:00 AM depending on how busy the restaurant was.

71.     Ammoora did not open its doors until 5:00 PM, however, and Plaintiff Wilgar would often spend between 45 minutes and an hour doing non-tipped side work before she received her first table of guests.

72.     Non-tipped side work, including but not limited to rolling silverware, cleaning silverware and glassware, participating in the pre-shift meeting, and otherwise preparing the restaurant for the arrival of guests.

73.     Likewise, during the last hour to hour and a half or so of the shift, Plaintiff Wilgar would engage in non-tipped side work, such as cleaning tables, silverware and glassware, and otherwise preparing the restaurant for the next day.

74.     As a result, Plaintiff Wilgar could spend approximately 1.5 to over 2 hours *per shift* engaging in non-tipped side work.  In other words, Plaintiff Wilgar could spend approximately

25% of her shift – depending on its length – engaged in non-tipped side work.  Therefore, Plaintiff Wilgar spent a substantial amount of time performing non-tipped work, as defined by 29 C.F.R. § 10.28(b)(3)(iv).

75.     However, at all times, regardless of whether Plaintiff Wilgar was actually engaged in tip-generating work, she was only paid a sub-minimum wage of $3.63/hour.

Further Factual Allegations

76.     Plaintiffs performed work for Defendants based on the promise of a certain, lawful compensation, and Defendants had a contractual obligation to pay Plaintiffs that promised compensation for the work that was performed.

77.     Additionally, the Plaintiffs were subject to a mandatory tip out based on a percentage of their sales.  On paper, Plaintiffs were required to tip out 5% of food, bottled water, and soda sold to server assistants, including food runners, and 7% of beer, liquor and non-alcoholic drinks that were not bottled water or soda (*i.e.* mocktails) to bartenders.

78.     Plaintiffs were also responsible for paying an excessively high 3% credit card processing fee on their credit card tips.

79.     These tip outs and processing fee payments were not calculated and paid out by Plaintiffs; rather, they were calculated and included as part of the payroll process.

80.     However, Plaintiffs, routinely noticed that even after all these various tip outs and processing fee payments, the amount of credit card tips they would receive on their paychecks, would be lower than expected based on the tip out formula.

81.     Plaintiff Gottke, for example, estimates that she would be short between $5.00 and $30.00 *per shift* in tips.

82.     When Plaintiffs asked for transparency from the Defendants about how exactly tip outs and

processing fees were actually being calculated and deducted from their tips, they were largely ignored, denied or dismissed.  Plaintiffs could not get a straight or clear answer from Defendants about how their tips were being handled.

83.     Then, on or about mid-July 2023, Defendants hired Nathan Cuthrell as an assistant general manager.

84.     On or about July 27, 2023, Defendants instituted yet another tip out, except this tip out was to the "house" (*i.e.* Defendants) to "compensate for commissions paid to the Wine Director," which meant Nathan Cuthrell, the assistant general manager.

85.     Specifically, Plaintiffs had to tip out 10% of wine bottle sales to Defendants to pay part of Mr. Cuthrell's compensation.

86.     As the assistant general manager, Mr. Cuthrell regularly and routinely managed and directed other employees, including Plaintiffs.  He would lead pre-shift meetings, provide beverage knowledge to the employees, and over the course of the evening, he would supervise and direct employees, including Plaintiffs, on which tables to service or prioritize.

87.     Mr. Cuthrell would provide verbal feedback to employees, including Plaintiffs, praising them when they did something well, or verbally disciplining them if they did something wrong.

88.     Mr. Cuthrell also interviewed and hired other employees, such as bussers.

89.     When Mr. Cuthrell first began working for Defendants, he indicated he wanted to have one-on-one conversations with all the employees about their experiences.

90.     During Mr. Cuthrell's conversation with Plaintiff Gottke, and in subsequent conversations as well, she raised numerous issues with him, including about the lengthy periods of time spent engaging in non-tipped work, changing the tip out structure from a percentage of sales to just a flat rate, greater transparency with how tip outs and processing fees are calculated and deducted from

credit card tips, and rotating seating so that each of the servers had an equal opportunity to earn tips.

91.     Mr. Cuthrell appeared to respond positively to Plaintiff Gottke's various concerns, and even immediately instituted a policy change to the rotation of seating to give servers an equal opportunity to earn tips.  He also urged Plaintiff Gottke to get the other employees on board regarding her other concerns, and he would similarly work on getting management and the owners (*i.e.* Defendants) on board and they could all come together to fix these problems.

92.     Plaintiff Gottke subsequently had numerous communications with other employees, and as a group, developed a proposal for Defendants.

93.     On August 12, 2023, she messaged Defendants, on behalf of all the tipped employees, requesting a meeting regarding creating a tip out policy that was transparent, easy to calculate and fair.

94.     The following day, Defendants A. Salkini and Kahoe met with Plaintiff Gottke and four of the eight servers who were working for Defendants at the time.  In addition to the issues mentioned in her message to Defendants, she also raised with them the issue of Mr. Cuthrell receiving a 10% tip out and stated she, and the other servers, did not believe it was a legally valid tip out.

95.     Following this conversation, Plaintiff Gottke was forcibly cut from the schedule on August 20 and August 21, 2023.

96.     Ordinarily, scheduled cuts are not mandatory. Instead, if business is too slow to warrant every server coming in, Defendants would ask who would like to be cut, and would invariably receive volunteers.  However, on August 20, and August 21, 2023, Plaintiff Gottke was told she was being cut from the schedule, even after she indicated she did not want to be cut.

97.     In the entire time Plaintiff Gottke had worked for Defendants, she had only seen a

mandatory cut given one other time – the day after a server complained that she had worked five hours of non-tipped work in a shift.

98.    Following two days of being forcibly cut from the schedule, Plaintiff Gottke was terminated.  The reasons given were nebulous and vague, including that Defendants did not see the relationship between Plaintiff Gottke, the restaurant, and management "working out;" that Defendants did not think Plaintiff Gottke was "happy" there; and that Defendants need to make changes to the pay structure but did not think Plaintiff Gottke would be happy about what they were planning to do to their tip out policy.

99.    Defendants forcibly cutting Plaintiff Gottke from the schedule two days in a row, followed by an immediate termination was intended to retaliate against Plaintiff Gottke, in violation of 29 U.S.C. § 215(a)(3).  Plaintiff Gottke had clearly filed a complaint, both on her own behalf as well as on behalf of the other servers concerning their wages and compensation.

100.    As a result of Plaintiff Gottke's retaliatory termination, she suffered anxiety, emotional distress, and lost wages.

101.    Likewise, on August 17, 2023, Plaintiff Wilgar met with Defendant J. Salkini to tell him that she believed the 10% tip out to Mr. Cuthrell was illegal.

102.    Three days later, on August 20, 2023, Defendant Kahoe promulgated a message to all the servers stating that the 10% tip out to Mr. Cuthrell would be redirected to the bar.

103.    Plaintiff Wilgar worked that night, and she approached a bartender named Russell in front of both Defendant Kahoe and Mr. Cuthrell and told Russell that his tip out would be increased due to the change in policy.  Not only was Russell surprised by this revelation unaware he would be receiving a tip out from the servers, Defendant Kahoe appeared shocked and angry that Plaintiff Wilgar had told this to Russell.  Upon information and belief, Defendants had no intention of

actually redirecting the 10% tip out from Mr. Cuthrell to the bartenders.

104.    Approximately two weeks later, Defendant Kahoe promulgated yet another change to the tipping policy at Ammorra, and announced they would be switching to a tip pool.  Defendant Wilgar sent a message to Defendants on September 8, 2023 to complain about yet another change to the compensation structure.

105.    About an hour and a half later, Mr. Cuthrell informed Defendant Wilgar she was cut for the night.  Defendant Kahoe then deleted the shifts she was scheduled for September 9, 2023.  Then on September 10, 2023, Mr. Cuthrell cut her from the shift she was scheduled to work that night again.

106.    Defendants provided no explanation for these cuts or deletions of scheduled shifts, nor did Plaintiff Wilgar ask to be cut or volunteer to be cut.

107.    Plaintiff Wilgar interpreted this string of unexplained and forced cuts as a constructive termination and fearing for her ability to provide for herself and pay rent and bills, she immediately began to search for another job.

108.    Defendants forcibly cutting Plaintiff Wilgar from the schedule three days in a row, with no explanation was a constructive discharge intended to retaliate against Plaintiff Wilgar, in violation of 29 U.S.C. § 215(a)(3). Plaintiff Wilgar had clearly made complaints, concerning her wages and compensation.

109.    As a result of Plaintiff Wilgar's retaliatory termination, she suffered anxiety, emotional distress, and lost wages.

110.    All of the Defendants know or should know that retaliation is unlawful under the FLSA. Nevertheless, the Defendants agreed and coordinated to terminate Plaintiff Gottke and constructively terminate Plaintiff Wilgar because they complained about their compensation.

Defendants actions were done with malice and retaliatory intent.

111.    All of the Defendants thus engaged in unlawful retaliation against Plaintiffs Gottke and Wilgar.

General Legal Allegations

112.    While the FLSA allows employers to pay less than minimum wage to employees who receive tips, 29 U.S.C. § 203(m), in order to take a so-called "tip credit" and apply it toward the employee's minimum wage, an employer must inform the employee that it will take a tip credit and otherwise strictly comply with the regulatory requirements of 29 C.F.R. § 531.59(b), which includes not retaining an employee's tips except in a valid tip pooling arrangement.

113.    Defendants were required by the FLSA (29 U.S.C. § 203(m)), to inform tipped employees, like Plaintiffs, that among other things, tipped employees were entitled to retain all of their tips except in a valid tip pooling arrangement, before they could potentially pay $3.63 an hour to Plaintiffs, an hourly wage which is lower than the requirements of 29 U.S.C. § 206. *See* 29 C.F.R. § 531.59(b).

114.    On March 23, 2018, Congress passed the Consolidated Appropriations Act of 2018 (CAA), which amended section 203(m) of the FLSA to add the following language: "An employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B).

115.    The CAA also amended another FLSA provision—section 216(b)—to state that "[a]ny employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages."

29 U.S.C. § 216(b).

116.    By failing to properly pay the minimum and overtime wages due to Plaintiffs, Defendants willfully violated very clear and well-established minimum wage "tip credit" provisions of the FLSA.

117.    In addition, by unlawfully retaining tips and maintaining a mandatory tip out consisting of tips voluntarily left by customers and received by servers, such as the Plaintiffs, and including an assistant general manager, who is a "manager" and "supervisor" within the terms of the CAA, a payout of tips from the tip pool, the Defendants willfully violated clear and well-established anti-tip retention provisions of the FLSA.

118.    Had Plaintiffs not been required to tip out a portion of their tips to Defendants to compensate them for the earnings of the assistant general manager, Plaintiffs would have retained larger amount of tips that were voluntarily left for them and other servers by customers.

119.    Defendants violated the FLSA insofar as they:

(a)    Failed to inform the Plaintiffs of the tip credit provisions of 29 U.S.C. § 203(m), thereby requiring Defendants to have paid at least $7.25/hour for each of the hours worked by Plaintiffs, as opposed to $3.63/hour, for regular (non-overtime) hours of work;

(b)    Maintained an invalid tip pooling arrangement or practice of requiring Plaintiffs to share their tips with a supervisor who is not a customarily tipped employee, resulting in not just the loss of the ability of the Defendants to take a tip credit, but also resulting in improper deductions from tips owed to the Plaintiffs;

(d)    Failed to properly pay Plaintiffs at the proper minimum hourly rate when Plaintiffs spent a substantial amount of time engaging in non-tipped work;

(e)    Failed to properly pay Plaintiffs at the proper overtime rate (as calculated in

accordance with U.S. Department of Labor regulations), when they worked over forty (40) hours per week;

(f)     Retaliated and terminated Plaintiffs Gottke and Wilgar for raising complaints about tipped employees' wages, retained tips, and Defendants' unlawful tip out to an assistant general manager.

120.    Furthermore, by failing to pay Plaintiffs all wages Defendants were contractually obligated to pay for the work they performed, Defendants materially breached their contractual obligation to Plaintiffs.

121.    By failing to pay Plaintiffs the minimum and overtime wages owed to them, as well as subjecting Plaintiffs to an invalid tip out arrangement, and unlawfully retaining tips, Plaintiffs seek liquidated (statutory) damages pursuant to the FLSA, pre-judgment interest on all amounts owed under the MWHL for unpaid minimum wages and overtime wages, and further seek to treble the amounts owed under the MWHL pursuant to the MWPCL, as well as recover reasonable attorneys' fees and costs as provided under the FLSA, the MWHL and MWPCL,

## **Causes of Action**

### **COUNT I**
**(FLSA –Failure to Pay Minimum Wage)**
**(All Plaintiffs)**

122.    Plaintiffs incorporate paragraphs 1-121 as set forth above, and states that Defendants' actions complained of herein constitute a willful violation of 29 U.S.C. § 206 (minimum wage), because Defendants have at all material times failed to pay Plaintiffs the proper minimum wage rate, free and clear of deductions and in a timely manner, by (1) refusing and failing to pay Plaintiffs at the proper minimum wage rate when they spent a substantial amount of time performing non-tipped work, and (2) refusing and failing to inform Plaintiffs about all of the

information related to Defendants' claim of a tip credit legally required to be provided by Defendants and otherwise failing to comply with the requirements of 29 U.S.C. § 203(m) and 29 U.S.C. § 206.

123.    As a result, Plaintiffs have the legal right to receive the full minimum wage, as required by Federal law and applicable Federal regulations.

**COUNT II**
**(FLSA – Failure to Pay Overtime)**
**(Plaintiff Gottke)**

124.    Plaintiffs incorporate paragraphs 1-123 as set forth above, and state that Defendants' actions complained of herein constitute a willful violation of Section 207(a)(1) of the FLSA, because Defendants, at all material times, have failed and otherwise refused to compensate Plaintiff Gottke for hours in excess of forty (40) hours in a work week at the lawful overtime rate as required by Federal law and Federal regulations that Plaintiff Gottke was entitled to receive from Defendants.

125.    A rate of $5.44/hour is an incorrect overtime rate, regardless of whether Defendant is entitled to take a "tip credit" (failed to properly inform Gottke pursuant to 29 U.S.C. § 203(m)(2)(A)).  To the extent Defendants paid Plaintiff Gottke at an overtime rate of $10.26/hour for other weeks where she worked overtime, this is still an incorrect overtime rate as it unlawfully assumes Defendants are entitled to take a "tip credit," which Plaintiffs deny that they are entitled to take.

126.    As a result, Plaintiff Gottke has the legal right to receive the full overtime wage, as required by Section 207 of the FLSA, 29 U.S.C. § 207.

**COUNT III**
**(FLSA – Anti-Tip Retention)**
**(All Plaintiffs)**

127.    Plaintiffs incorporate paragraphs 1-126 as set forth above, and states that the FLSA expressly prohibits employers, managers and supervisors from keeping any portion of tips received by employees for any purpose, regardless of whether the employer takes a tip credit.  *See* 29 U.S.C. §203(m)(2)(B).

128.    Defendants' actions complained of herein constitute a violation of 29 U.S.C. §203(m)(2)(B), insofar as Defendants have, at all material times, (1) refused and failed to allow Plaintiffs to retain all tips, and (2) required Plaintiffs to tip out personnel prohibited from receiving tips pursuant to 29 U.S.C. §203(m)(2)(B).

129.    Defendants are also not allowed to retain tips to compensate for credit card processing charges, under the plain terms of 29 U.S.C. §203(m)(2)(B).  To the extent that Defendants are allowed to take such charges, the charges that Defendants took were in excess of its actual charges.

130.    Defendants knew of or showed reckless disregard for the provisions of the FLSA that prohibit employer retention of tips.  *See* 29 U.S.C. §203(m)(2)(B).

131.    By refusing and failing to allow Plaintiffs to retain all tips, even after any lawful tip outs, and by maintaining an invalid tip out that included employee tips being shared with an assistant general manager, and by retaining tips for credit card processing charges (and doing so in excess of actual charges), Defendants willfully and intentionally retained Plaintiffs tips in violation of 29 U.S.C. §203(m)(2)(B).

132.    As a result, Plaintiffs have been damaged and are entitled to be compensated for their losses, which are the loss of tips that they otherwise would have been entitled to receive but for Defendant's violation of the FLSA's anti-tip retention provisions, 29 U.S.C. §203(m)(2)(B) and 29 U.S.C. § 216(b).

### <u>COUNT IV</u>
**(MWHL - Failure to Pay Minimum Wage)**

**(All Plaintiffs)**

133.    Plaintiffs incorporate paragraphs 1-132 as set forth above, and states that Defendants' actions complained of herein constitute a willful violation of Md. Ann. Code LE Art. § 3-413 (minimum wage), because Defendants have at all material times failed to pay Plaintiffs the proper minimum wage rate, free and clear of deductions and in a timely manner, and otherwise failed to comply with the requirements of Md. Ann. Code LE Art. § 3-419 by (1) refusing and failing to pay Plaintiffs at the proper minimum wage rate when they spent a substantial amount of time performing non-tipped work, and (2) refusing and failing to inform Plaintiffs about all of the information related to Defendants' claim of a tip credit legally required to be provided by Defendants and otherwise failing to comply with the requirements of 29 U.S.C. § 203(m) and 29 U.S.C. § 206.

134.    As a result, Plaintiffs have the legal right to receive the full minimum wage, as required by Maryland law and applicable Maryland regulations.

## <u>COUNT V</u>
### (MWHL - Failure to Properly Pay Overtime)
### (Plaintiff Gottke)

135.    Plaintiffs incorporate paragraphs 1-134 as set forth above, and state, in addition, that Defendants' actions complained of herein constitute a violation of Md. Ann. Code LE Art. § 3-420 (overtime) because Defendants have, at all material times, failed and otherwise refused to compensate Plaintiff Gottke for all hours worked in excess of forty (40) hours a work week at the lawful overtime rate, as computed under Md. Ann. Code LE Art. § 3-420.

136.    Defendants' actions complained of herein constitute a violation of Section 3-415 of the MWHL, because Defendants failed to compensate Plaintiff Gottke at a proper overtime rate for hours worked in excess of forty (40) in a work week at a rate not less than one and one-half times

her regular rate of pay, as required by Maryland law.

137.   A rate of $5.45/hour is an incorrect overtime rate, regardless of whether Defendant is entitled to take a "tip credit" (failed to properly inform Gottke pursuant to Md. Ann. Code LE Art. § 3-419).  To the extent Defendants paid Plaintiff Gottke at an overtime rate of $10.26/hour for other weeks where she worked overtime, this is still an incorrect overtime rate as it unlawfully assumes Defendants are entitled to take a "tip credit," which Plaintiffs deny that they are entitled to take.

138.   As a result, Defendants owe Plaintiff Gottke overtime wages in the amount of one and one-half (1.5) times their regular rate of pay, for all work weeks she worked in excess of forty (40) hours per week.

## COUNT VI
### (MWPCL – Failure to Pay Earned Wages)
### (All Plaintiffs)

139.   Plaintiffs incorporate paragraphs 1-138 as set forth above, and states that the actions of Defendants in refusing to pay wages free and clear in proper amounts is a violation of the MWPCL, Md. LE Art. § 3-502(a)(ii) and § 3-505(a).

140.   That the MWHL further compels each covered employer and non-exempt employee to make, as part of any working agreement, a promise to pay minimum wage compensation as applicable under the MWHL.

141.   That impliedly, by operation of law, Plaintiffs are entitled to be paid statutory minimum wages by Defendants, which have not been paid during the course of Plaintiffs' employment with the Defendants.

142.   That there are no bona fide disputes between the parties as to the right of the Plaintiffs to be paid all lawful wages due arising from his employment.  Defendants know, or should know,

that they are covered entities under the MWHL, and that Plaintiffs performed work as employees for which he was not properly compensated.

143.     Plaintiffs are thus entitled under MWPCL, Md. LE Art. § 3-507.2 to an award of treble damages and attorneys' fees with respect to the wages, i.e., the MWHL-mandated wages that have gone unpaid.

**COUNT VII**
**(FLSA – Retaliatory Termination)**
**(Plaintiffs Gottke and Wilgar)**

144.     Plaintiffs incorporate paragraphs 1-143 as set forth above, and state that Defendants' actions complained of herein constitute a violation of 29 U.S.C, § 216(b) because Defendants engaged in action deliberately designed to be materially adverse to Plaintiffs Gottke and Wilgar, by forcibly cutting shifts contrary to practice, and terminating or constructively terminating Plaintiff Gottke and Wilgar, because they had filed complaints with the Defendants regarding their wages and compensation.

145.     Defendants knew Plaintiff Gottke and Wilgar had filed complaints with them concerning their wages and compensation and knew or should have known the FLSA prohibits retaliation against employees who complain or initiate a proceeding under or relating to the rights and protections of the FLSA.  *See* 29 U.S.C. § 215(a)(3).

146.     Defendants' actions complained of herein constitute retaliatory termination in violation of the FLSA and were done with malice and retaliatory intent to punish Plaintiffs Gottke and Wilgar for their complaints about their wages and compensation.

147.     As a result, Plaintiff Gottke and Wilgar have the legal right to receive damages from the Defendants, in terms of economic damages, emotional distress, humiliation, stress, loss of enjoyment of life and reputation.

148.     Furthermore, Defendants termination of Plaintiff Gottke and Wilgar was made with actual malice, insofar as the actions were a conscious and deliberate wrongdoing, made with evil or wrongful motive, intent to injure, ill will, or fraud in reckless disregard for the legally protected rights of Plaintiffs Gottke and Wilgar, entitling Plaintiff Gottke and Wilgar to punitive damages in an amount according to proof.

**COUNT VIII**
**(Common Law – Breach of Contract)**
**(All Plaintiffs)**

149.     Plaintiffs incorporate paragraphs 1-148 as set forth above, and state that the actions of Defendants, in refusing to pay Plaintiffs the wages that they are due, have materially breached their contractual obligation to pay Plaintiffs the wages Defendants promised to pay her.

150.     A contract, whether explicitly in writing or impliedly through acts or words, existed between the Plaintiffs and Defendants, where Plaintiffs would perform work for Defendants in exchange for a certain promised and lawful compensation, that would be paid to Plaintiffs on a regular schedule.

151.     By failing to pay Plaintiffs for all hours worked and at the legally required rate, including for hours worked in excess of forty (40) hours per work week, Defendants materially breached their contractual obligation to pay Plaintiff her agreed-upon compensation.

152.     By continuing to perform work for Defendants under the contract, while receiving inadequate compensation in return, Plaintiffs have suffered losses and damages equivalent to the unpaid minimum and overtime wages.

**Prayer**

Based on the foregoing allegations, Plaintiffs respectfully requests that this Court grant money damages in an amount to be determined by the evidence, exclusive of attorney's fees and

costs; and in support thereof, requests this Honorable Court to issue the following Orders:

(a) Order Defendants to pay Plaintiffs all unpaid minimum and overtime wage payments determined by the Court to be due and owing, under the FLSA as well as a sum of liquidated damages in an amount equal to the amount of any unpaid minimum and overtime wage payments awarded to Plaintiffs, pursuant to the FLSA;

(b) Order Defendants to pay Plaintiffs all unlawfully retained tips determined by the Court to be due and owing, under the FLSA as well as a sum of liquidated damages in an amount equal to the amount of any unpaid tips awarded to Plaintiffs, pursuant to the FLSA;

(c) Order Defendants to pay the Plaintiffs an amount equal to triple the amount of unpaid minimum and overtime wages owed Plaintiff, under the MWHL, after an accounting has been performed, as Plaintiffs are entitled to such damages under the MWPCL;

(d) Order Defendants to pay the Plaintiffs all wages promised, determined by the Court, to be due and owing under the employment contracts between Plaintiffs and Defendants;

(e) Order Defendants to make whole Plaintiffs Gottke and Wilgar by providing back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of the unlawful employment practices made actionable under the FLSA, in amounts to be determined at trial;

(f) Order Defendants to make whole Plaintiffs Gottke and Wilgar by providing compensation for past and future nonpecuniary losses resulting from the unlawful employment practices complained of above, including emotional pain, suffering, depression, anxiety, loss of enjoyment of life, damage to work/career reputation, humiliation, and other physiological and psychological symptoms and conditions, in amounts to be determined at trial;

(g) Order Defendants to pay Plaintiffs Gottke and Wilgar punitive damages for their unlawful

and retaliatory terminations, in amounts to be determined at trial;

(h)  Award Plaintiffs their attorneys' fees and costs in pursuing this action;

(i)  Award Plaintiffs interest on any sums determined due and owing from Defendants,

including pre-judgment interest on attorneys' fees and costs in pursuing this action;

(j)  Grant Plaintiff any additional relief that the Court deems appropriate and just.

Respectfully submitted,

/s/ _____
Howard B. Hoffman, Esq.
HOFFMAN EMPLOYMENT LAW, LLC
Federal Bar No. 25965
600 Jefferson Plaza, Suite 204
Rockville, MD 20852
(301) 251-3752
(301) 251-3753 (fax)

/s/ signed with permission
Jordan S. Liew, Esq.
HOFFMAN EMPLOYMENT LAW, LLC
Federal Bar No. 20509
600 Jefferson Plaza, Suite 204
Rockville, MD 20852
(301) 251-3752
(301) 251-3753 (fax)

*Attorneys for Plaintiff*

## JURY DEMAND

The Plaintiffs, by their attorneys, hereby demand a jury trial as to all issues triable by a

jury.

_____/s/_____
Howard B. Hoffman